STANLEY MILLEDGE, Associate Judge.
Desiring to build and market a co-operative apartment house, a partnership in which Flood was the manager, employed Shinn, a general contractor, to erect the building for $369,040 (with extras). The contract was in the printed American Institute of Architects form for use between owner and contractor. Article IV of this form deals with progress and final payments. The spaces to be filled in indicating the proportion of the contract price to be paid at designated stages of progress in construction were all left blank. Instead, these words after “Progress Payment” were typed in: “according to the terms of the escrow agreement attached hereto and initialed by the parties and becomes a part of this agreement.” The escrow agreement referred to was a printed form used to prescribe the rate of payments by purchasers of apartments.
The purchasers paid according to the rate of progress in construction as indicated by the supervising architect’s certificate. The bank in turn was authorized to pay the money to the developers (Flood) according to the progress of construction. The final payment of 30% was to be withheld until final completion.
The controversy largely turns on the meaning of Article IV of the construction contract. The chancellor adopted the ap-pellees’ view that the contract required a withholding of 30% of the contract price. The appellants contend that the escrow agreement related to the purchase price of apartments, not to payments to the contractor. They say that the written construction contract was silent on the matter of the percentage of agreed price to be withheld until final payment and therefore parol evidence was admissible to show that the developers and the contractor really agreed that the percentage to be withheld was 20%. Their alternative contention is that the contract is ambiguous on this point and parol evidence properly established their version of tlfe contract.
The contractor failed to pay the subcontractors, eleven of whom sought foreclosure of their lien claims, contending that 30% of the contract price, or $110,712, was a fund from which the liens should be paid. Numerous other like lienors were made defendants. After trial but before adjudication fourteen of the lienors were paid off at substantial discounts. The amount paid for this purpose was deducted from $110,721 and the remainder divided ratably among the twelve unpaid lienors, who received 89.9 cents on the dollar.
The developers paid the contractor $294,-996.18 and withheld $74,054.07. This is, they say, the proper fund for distribution. There is no disagreement concerning the proposition that any final payment to the contractor, beyond that specified in the construction contract, was not “properly paid” within the meaning of § 84.05, Fla. Stat., F.S.A., since the contractor did not, and could not, secure the sworn statement as to his paying laborers and materialmen as required by § 84.04(3), Fla.Stat., F.S.A. *467 See Renuart Lumber Yards, Inc. v. Stearn, Fla.1957, 95 So.2d 517.
The chancellor found that the construction contract required the developers to withhold 30% of the price for final payment. We think that he was correct. Instead of filling- in the blank spaces of Article IV of the printed form, the parties chose to adopt, as the terms of the contract in the matter of progress payments, the schedule of payments by the bank, as escrow holder, to the developers, of the funds received in payment of the purchase price of apartments. Had the printed contract been silent on the subject of progress payments, it might be said that the contraht was incomplete and failed to state all of the terms. The parol agreement between developers and Shinn to withhold 20% would have been admissible. It was not silent. It is true that the schedule adopted by making the escrow agreement a part of the construction contract relates to disposition of the purchase price of apartments ; this is what the parties to the construction contract said they meant to do. It was agreed with purchasers of apartments that 30% of the money paid in by them would be withheld until completion of construction and Flood and Shinn agreed with each other that this same schedule would apply to the payments from developers to contractor. This seems a rational arrangement. If this is not what the parties to the construction contract intended, their making the escrow agreement a part of the construction contract in lieu of Article IV makes no sense at all, and no explanation of this has been suggested by the appellants. We see no ambiguity in the fact that having contracted to withhold 30% of the contract price, Flood and Shinn orally agreed to a withholding of 20%. To the usual problem of modifying or contradicting a written contract by parol evidence is added the consideration that the apartments were sold, and escrow agreements entered into, on the basis of the terms of the existing construction contract. The people buying co-operative apartments were parties in interest to the construction contract. It could not be modified without their consent.
The second point made by appellants is that they and not the remaining lienors should have the benefit of the favorable settlements with fourteen of the lien-ors. The total of the original group of liens was $154,255.20, to be paid from a fund of $110,712 (30% of contract price). This comes to 71.6 cents on the dollar. Appellants say that by disposing of fourteen of the claims at 50 and 60 cents on the dollar should not increase beyond 71.6 cents on the dollar the amount which the remaining twelve lienors should get. As the appellants suggest, the law favors compromises and settlements but that principle has no application here; nor does it matter that there was no dispute as to the validity of the claims settled. What does matter is the question of whose money (in equity) was used to settle with the fourteen lien-ors. If it was the developers’ money, then the saving is theirs; .if it is the lienors’ money, the saving is theirs. The fund of-' $110,712 is one which the developers held in trust for the unpaid lienors. That they actually had only $78,080 (20% of the contract price) does not matter. They should have had 30% of the price and equity considers that as done which ought to be done. This fund or so much of it as was needed to discharge lienors in full belonged, in equity, to the whole group of lienors. When some of the members of this class removed themselves from the class on receiving less than their pro rata share, the remaining members were able to receive more than their original pro rata share. The payments which induced some of the members of the class to retire came from money which, in equity, was the money of the lienors. Only if they could be paid in full would the fund remaining, if any, belong to the developers.
The same principle disposes of the appellants’ last point that interest on the lien claims should not have been allowed. *468 The fund of $110,712 belonged, in equity, to the lienors so when payment to them was improperly withheld, interest should be allowed. The amount and validity of the liens has never been in dispute. Only the size of the fund available for their discharge has been in dispute. The appellants could have saved the interest by paying out the fund ratably to the lienors, by depositing the money in court by a bill of interpleader, or by depositing it in court when this complaint was filed. They have improperly kept money belonging to others. We think that interest is allowable without the aid of statute, but we note that § 84.24, Fla.Stat., F.S.A., in dealing with the procedure for transferring a mechanic’s lien from land to bond, requires that the amount of the bond should cover the interest in the sum claimed by the lienor. This seems a clear legislative declaration that mechanic’s liens bear interest.
The decree appealed from is affirmed.
CARROLL, CHAS., C. J., and PEARSON, J., concur.